UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:15-cv-00584-FDW-DSC

| | | |
|---|---|---|
| LEGACY DATA ACCESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| MEDIQUANT, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court upon the filing of several post-trial motions by Plaintiff and Defendant. Plaintiff has filed a Motion for Attorneys' Fees (Doc. No. 108), a Motion to Amend Judgment (Doc. No. 120), and a Motion for a Permanent Injunction (Doc. No. 123). Defendant has moved under Rule 59(a) for a new trial (Doc. No. 126), and in the alternative, moves under Rule 49(b) and 50(b) (Doc. No. 124). Defendant also seeks an amendment to the Judgment under Rule 59(e) (Doc. No. 126). All parties have responded to the pending motions, and they are now ripe for resolution. The Court addresses each motion but not necessarily in the order filed.

## I.  BACKGROUND

In the interests of judicial economy, the Court provides a general overview of the case here but summarizes the specific background relevant to the issues raised by the parties' motions in the analysis. This litigation stems from William Jesse Rowland's resignation and departure from his position with Plaintiff and the acceptance and commencement of work for Defendant. After a six day trial, the jury found Defendant liable for (i) wrongfully interfering with the non-disclosure and non-competition provisions of the Employment, Non-Disclosure, Non-Solicitation, and Non-Competition Agreement (the "Agreement") between Rowland and Plaintiff; (2) misappropriation

of trade secrets; (3) unfair or deceptive trade practices, and (4) punitive damages.  The jury found

that Defendant was not liable for wrongfully interfering with prospective contracts between

Plaintiff and Ascension Health, Greenville Health System, El Camino, and Eskenazi.  The jury

awarded Plaintiff (1) $1 for wrongful interference with the non-disclosure and non-competition

provisions of the Agreement; (2) $600,000 in damages for misappropriation of trade secret(s); and

(3) $1 for unfair or deceptive trade practices.  The jury also awarded Plaintiff $100,000 in punitive

damages.

## II.    ANALYSIS

### A.    Defendant's Post-Trial Motion under Rule 59(a) and Alternative Motion under Rule 50(b)

Defendant moves for a new trial under Rule 59(a) on Plaintiff's claim for misappropriation

of trade secrets and for punitive damages.  "The grant or denial of a motion for new trial is entrusted

to the sound discretion of the district court and will be reversed on appeal only upon a showing of

abuse of discretion." Cline v. Wal-Mart Stores, 144 F.3d 294, 305 (4th Cir. 1998) (citing Gasperini

v. Center for Humanities, Inc., 518 U.S. 415, 435 (1996)).  A court may grant a new trial on some

or all of the issues "for any reason which a new trial has heretofore been granted in an action at

law in federal court[.]"  Fed. R. Civ. P. 59(a)(1)(A).  Acceptable reasons include: "(1) the verdict

is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will

result in a miscarriage of justice, even though there may be substantial evidence which would

prevent the direction of a verdict."  Cline, 144 F.3d at 301 (quoting Atlas Food Sys. & Servs., Inc.

v. Crain Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996)).  When making this determination,

the court may weigh the evidence and consider the credibility of witnesses.  Wilhelm v. Blue Bell,

Inc., 773 F.2d 1429, 1433 (4th Cir. 1985) (citing Wyatt v. Interstate & Ocean Transport Co., 623 F.2d 888, 891-92 (4th Cir. 1980)).

Defendant also renewed its motion under Rule 50 of the Federal Rules of Civil Procedure and moves for judgment as a matter of law on many of the same issues raised in its post-trial motion under Rule 59(a). Accordingly, the Court considers each of these alleged errors under Rule 59(a) and Rule 50(b). A motion under Rule 50(b) "assesses whether the claim should succeed or fail because the evidence developed at trial was insufficient as a matter of law to sustain the claim." Belk, Inc. v. Meyer Corp., 679 F.3d 146, 155 (4th Cir. 2012). Upon a Rule 50 motion, the court cannot reweigh the evidence or consider the credibility of the witness and must view "all the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in [the prevailing party's] favor." Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999). A jury's verdict will withstand a motion under Rule 50 unless the Court "determines that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party." Tools USA and Equip. Co. v. Champ. Frame Straightening Equip., Inc., 87 F.3d 654, 656-57 (4th Cir. 1996) (quoting Winant v. Bostic, 5 F.3d 767, 774 (4th Cir. 1993)); see also Konkel, 165 F.3d at 279.

### 1. Evidentiary Rulings

Defendant first argues that several of the Court's evidentiary rulings are grounds for a new trial. Errors in admitting or excluding evidence are not grounds for a new trial "[u]nless justice requires[.]" Fed. R. Civ. P. 61. An error is harmless and does not require a new trial if the court can "say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors.'" Taylor v.

Virginia Union Univ., 193 F.3d 219, 235 (4th Cir. 1999) (citations omitted).  By focusing on "whether the error itself had substantial influence[,]" this analysis allows the court to distinguish between harmless errors and those impacting a substantial right.  Id.  As discussed herein, the Court concludes that the judgment was not substantially swayed by errors.

### a. Trade Secrets

Defendant contends it was unfairly prejudiced by the admission of evidence at trial on trade secrets that were not identified in Plaintiff's response and supplementary responses to Defendant's interrogatories.  However, Plaintiff disclosed in its response to interrogatory three its contention that Rowland, Defendant's employee, possessed Plaintiff's trade secrets and in response to interrogatory two in an attached exhibit listed the alleged trade secrets.  This list enabled Defendant to know what it was accused of misappropriating.  See e.g., Washburn v. Yadkin Valley Bank and Trust Co., 190 N.C. App. 315, 326, 660 S.E.2d 577, 585 (2008) ("To plead misappropriation of trade secrets, 'a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur.'").  Further, the answers of James Yuhas at his depositions reiterated that the trade secrets and proprietary information at issue was not just the MsToPg tool but included multiple categories of information believed to be on the SD card possessed by Defendant's employee Rowland.  Therefore, any purported inadequacy of the identification of the trade secrets was not for lack of Plaintiff's disclosure.  Admission of this evidence was not unfair.  See Fed. R. Evid. 403.

## b. Testimony of Ankit Oza and James Yuhas

Defendant also contends the Court erred by not excluding, on account of Plaintiff's alleged non-disclosure, testimony on damages sustained for misappropriation and testimony on damages from James Yuhas and Ankit Oza.[1]  However, Plaintiff disclosed in its interrogatory six the categories of damages it sought and identified Yuhas and Oza as potential witnesses with knowledge that could be contacted.  Defendant served interrogatories and deposed individuals about their personal knowledge of damages, but Defendant did not seek identification of a deponent to address damages under Federal Rule of Civil Procedure 30(b)(6).  Plaintiff contends that interrogatories to an entity are the functional equivalent of a Rule 30(b)(6) deposition, but a Fed. R. Civ. P. 30(b)(6) designee "must testify about information known or *reasonably* available to the organization" rather than merely answering an interrogatory furnishing "information available to the party[,]" Fed. R. Civ. P. 33(b)(1)(B).  (Emphasis added).  The burden on a Rule 30(b)(6) designee is therefore greater than an agent answering an interrogatory on behalf of an entity.  See Wilson v. Lakner, 228 F.R.D. 524, 528 (D. Md. 2005) ("The designee must be prepared to the extent that matters are reasonably available, whether from documents, present or past employees, or *other sources*." (emphasis added)); United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996) ("[T]he designee must not only testify about facts within the corporation's knowledge, but also its subjective beliefs and opinions.  The corporation must provide its interpretation of documents and events." (internal citations omitted)).  Thus, Defendant's decision

---

[1]  Defendant claims Yuhas read from an expert report instead of only testifying as to his personal knowledge.  Static Control Components v. Darkprint Imaging, 240 F. Supp. 2d 465, 481 (M.D.N.C. 2002) (explaining that a business owner or officer can testify as a lay witness under Rule 701 of the Federal Rules of Evidence regarding lost profits and damages based on personal knowledge but cannot rely on hearsay).  However, the record does not support his contention.

not to employ Federal Rule of Civil Procedure 30(b)(6) created any purported disadvantage suffered by Defendant.

Further, Defendant's Motion in Limine only sought exclusion of testimony and evidence of Plaintiff's alleged lost profits (Doc. No. 71) and as clarified at trial the objection was limited to "the three or four or five million that their expert said they lost in profits because they lost customers." (Rough Trial Tr., July 17, 2017, 6:4-6).[2] At trial, the jury found in favor of Defendant on all claims of wrongful interference with prospective contracts with customers. Therefore, even if the admission was wrongful, most if not all of the error was harmless.

### c. Georgia Court Order

Before this litigation began, Plaintiff sued Rowland in the Superior Court of Cobb County, Georgia. In that litigation, a superior court judge entered an Order denying Plaintiff's Emergency Motion for Temporary Restraining Order against Rowland (the "Georgia Order"). (Doc. No. 34-7). Defendant contends this Order supports its proposition that "Defendant acted reasonably when it continued to employ Rowland and cover his legal expenses" and argues the Court erred by excluding it. (Doc. No. 127 at 9). However, temporary restraining orders and preliminary injunctions are not intended to resolve the case on the merits, <u>Eastman Kodak Co. v. Fotomat Corp.</u>, 317 F. Supp. 304, 325 (N.D. Ga. 1969) ("It is not the function of a preliminary injunction to decide a case on the merits . . . ." (citations omitted)), and they can denied on grounds unrelated to the merits of the claim. <u>See</u> Ga. Code Ann. § 9-11-65(b)(1) ("A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if: (1) It

---

[2]  The rough transcript is not certified; however, the Court refers to the rough transcript to help explain the Court's ruling. The court reporter has confirmed the accuracy of all portions of the rough transcript cited herein.

clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and (2) The applicant's attorney certifies to the court, in writing, the efforts, if any, which have been made to give the notice and the reasons supporting the party's claim that notice should not be required); Holland Ins. Group v. Senior Life Ins. Co., 329 Ga. App. 834, 841, 766 S.E.2d 187, 194 (2014) ("When determining whether to issue an interlocutory injunction, the trial court must consider whether (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting an interlocutory injunction will not disserve the public interest."). Here, the superior court judge entered a one-page order finding that Plaintiff's case did not meet the burden required for a temporary restraining order and reserving ruling on all issues. The superior court judge did not elaborate. Thus, the Georgia Order cannot be interpreted to address the merits of Plaintiff's complaint against Rowland or support the reasonableness of Defendant's continued employment and payment of legal expenses for Rowland as Defendant contends. The Georgia Order is not relevant to this litigation; it does not consider, touch on, or contemplate the disputes between Plaintiff and Defendant in this case. Even if relevant, any alleged probative value would be outweighed by its tendency to mislead the jury by suggesting that another court has previously addressed the merits of the dispute between Plaintiff and Defendant.[3] Fed. R. Evid. 403. Therefore, the Court finds no error.

---

[3] It is undisputed that the Georgia Order has no preclusive effect in this litigation or any litigation.

### d. Clark Walton Testimony

Defendant argues the Court improperly allowed Clark Walton to testify as a lay witness about his examination of Rowland's Secure Digital Card ("SD Card") when the Court struck Walton's expert report addressing this examination on October 26, 2016 as untimely. Plaintiff, however, contends this was proper because Walton had to examine the SD card in order to determine if this information was transferred to Rowland's computer or any other device, which was allowed by the Court's Order on March 14, 2017. (Doc. No. 79). The Court agrees. The Order allowed Plaintiff's examiner to "review the image of Rowland's Computer" to among other things, "determine if any information related to LDA files and the SD card was transferred from Rowland's Computer to any other person or device." (Doc. No. 79 at 3). As a result, the Order impliedly authorized an examination by Plaintiff's expert of the SD card to the extent necessary to determine if information from the SD card was transferred from Rowland's computer. The Order did not preclude Walton from being Plaintiff's expert, and Defendant did not seek such limitation or file any objection to the Order. Thus, Defendant was on notice that the contents of the SD card as compared to Rowland's computer and other devices would fall within the scope of permissible discovery and would be included in the expert report. Defendant also knew that under the Order it was permitted to depose the examining expert and serve a rebuttal expert report. Therefore, Defendant was not prejudiced by the admission of testimony from Walton about the contents of the SD card; Defendant had the opportunity to depose Walton and assess his testimony. See Quality Built Homes, Inc. v. Village of Pinehurst, No. 1:06cv1028, 2008 WL 3503149, at *4-5 (M.D.N.C. Aug. 11, 2008) (striking engineer's affidavit where untimeliness of offering party precluded adverse party from deposing engineer). Further, the Court limited Walton's testimony

on the contents of the SD card to lay testimony—things the average person with a computer could observe. As a result, the sanction imposed on Plaintiff on October 26, 2016 still impacted the scope of Walton's testimony. Thus, the Court finds no error.

### e. Brad Shipe Testimony

Defendant argues the exclusion of the testimony of Brad Shipe, Rowland's attorney in the litigation in Georgia, was an error and prejudicial. The Court excluded the testimony as untimely as Defendant did not supplement their initial disclosures or discovery responses to identify him as a witness even though the issue of spoliation had been raised previously. Fed. R. Civ. P. 37(c)(1). Defendant argues the delay was justified because it believed spoliation was no longer an issue in the case after the Court struck Plaintiff's designation of Walton as Plaintiff's proposed expert witness as untimely. However, Defendant overlooks the fact that in March, the Court allowed the examination of Rowland's computer by Plaintiff's expert. The authorized examination and resulting order, to which no objection was filed, allowed "searches for evidence of possible destruction of data or attempts to destroy data." (Doc. No. 79 at 3). Hence, Defendant was clearly on notice that attempts to destroy or the destruction of data, and consequentially spoliation, was an issue in this case. Thus, waiting until July, after the selection of the jury, to identify Shipe as a witness was not justified. Additionally, the deposition of Shipe, which occurred after the Court suspended trial to allow the deposition, identified for the first time a discussion with an attorney associated with Plaintiff that had not been identified or involved with this litigation. Given that this deposition occurred in the midst of the trial, Plaintiff had no opportunity to prepare for Shipe's testimony, including but not limited to deposing the attorney identified by Shipe. Therefore, Defendant's delay was not harmless. The Court, accordingly, finds no error.

**2. Jury Instructions under Rule 59(a) and Related Arguments under Rule 50(b)**

Defendant also argues that the instructions to the jury and verdict form prejudiced Defendant, entitling Defendant to a new trial. An error in jury instructions is not reversible and not prejudicial if as a whole, the instructions adequately state the controlling law. See e.g., Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 870 (4th Cir. 1999). Here, Defendant argues that the Court erred by (1) allowing the jury to consider Plaintiff's claim for wrongful interference with the non-disclosure provision; (2) not giving a special instruction on each tortious interference with contract claim that "[a]s to this claim, actual damages means damages in excess of one dollar"; (3) allowing the jury to consider whether information besides the MsToPg tool is a trade secret; (4) allowing the jury to find Defendant liable for misappropriation of trade secrets under an agency theory; and (5) giving a spoliation instruction. (Doc. No. 127 at 14-15). Defendant makes related arguments under Federal Rule of Civil Procedure 50(b), which the Court also addresses herein.

**a. Wrongful Interference with Non-Disclosure Provision**

Defendant argues that an instruction on wrongful interference with the Agreement's non-disclosure provision was improper because Plaintiff did not present substantial evidence to support that Defendant induced Rowland to breach the non-disclosure provision of the Agreement. (Doc. No. 127 at 14; Doc. No. 125 at 9). Defendant contends the lack of substantial evidence for this effect is grounds for a new trial, and in the alternative for judgment as a matter of law under Rule 50(b). Regardless of whether the Court considers this error under Rule 59(a) or 50(b), Defendant is not entitled to a new trial or judgment as a matter of law. No miscarriage of justice has occurred, and Plaintiff submitted substantial circumstantial evidence and testimony, as summarized below,

to support the claim. To establish the tort of interference with contract, the plaintiff must show "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." United Labs., Inc. v. Kuykendall, 322 N.C. 643, 661-62, 370 S.E.2d 375, 387 (1988) (citing Childress v. Abeles, 240 N.C. 667, 674, 84 S.E.2d 176, 181 (1954)). Here, Plaintiff presented evidence of the Agreement which contained a non-disclosure provision and that Defendant was informed of the Agreement a couple months after hiring Rowland. Defendant gave Rowland an oral job offer, and soon thereafter, Rowland submitted his two week notice and backed up his data from his work computer on a SD card. Rowland had not backed up his data on these devices in eight months and he backed up data that he did not use in the performance of his work for Plaintiff. Testimony was also presented that Plaintiff's data was automatically backed up, and Plaintiff had a policy against employees' unilaterally backing up their data. On his last day of work, Rowland did not return the SD card and remained in possession of the SD card when he commenced work for Defendant. Further, Defendant did not want Plaintiff to learn of Rowland's employment and discussed steps to prevent Plaintiff from learning of this. Defendant knew that many of Plaintiff's former employers were subject to non-disclosure and non-competition provisions. Evidence was also presented that Defendant permitted Rowland, unlike most of Defendant's employees in similar positions, to work remotely full time from his home in Georgia, instead of its corporate office. On top of that, evidence was presented that Rowland and his attorney destroyed data on Rowland's personal computer and on the SD card in close proximity to relevant events in the litigation brought by

Plaintiff.  Nevertheless, Defendant continued to employ Rowland, an at-will employee, despite learning about the Agreement and his possession of the SD card.  Testimony that Defendant paid and continues to pay Rowland's attorneys' fees and had only paid the attorneys' fees for one other employee was also presented.  Given this evidence, the verdict was not contrary to the clear weight of evidence, and the Court cannot conclude that the evidence was insufficient as a matter of law to sustain the claim for tortious interference with the non-disclosure provision.

### b. Actual Damages

Defendant argues it is entitled to a new trial because the Court erred by not giving the special instruction requested by Defendant on each tortious interference with contract claim that "[a]s to this claim, actual damages means damages in excess of one dollar."  In the alternative, Defendant argues that it is entitled to judgment as a matter of law because Plaintiff did not produce sufficient evidence to support a jury verdict of $1 in actual damages.  Defendant also contends Plaintiff did not produce sufficient evidence to support any damages award.

However, as to Defendant's first request, Defendant has not shown that this proposed jury instruction, which the Court declined to give, "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case."  United States v. Duygu Kivanc, 714 F.3d 782, 794 (4th Cir. 2013) (quoting Noel v. Artson, 641 F.3d 580, 586 (4th Cir. 2011)).  Defendant has not cited any North Carolina case or law to support its first contention that "[a]s to [a claim for wrongful interference with contract], actual damages means damages in excess of one dollar."  Contra Godwin v. Vinson, 254 N.C. 582, 587, 119 S.E.2d 616, 620 (1961) (defining actual damages as "compensation for injuries and losses which are the direct

and proximate result" of the wrong); Black's Law Dictionary (10th ed. 2014) (defining actual damages as "[a]n amount awarded to complainant to compensate for a proven injury or loss; damages that repay actual losses"). Although it may be atypical for a jury to find actual damages of one dollar, the law in North Carolina does not preclude such an award merely because the amount is one dollar. Therefore, the Court did not err or prejudice Defendant by declining to give the proposed jury instruction.

Thus, the next inquiry is whether viewing the evidence in the light most favorable to Plaintiff and drawing inferences in favor of Plaintiff, "the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party." Winant v. Bostic, 5 F.3d 767, 774 (4th Cir. 1993). Here, Defendant argues that the evidence produced by Plaintiff cannot support a jury verdict of one dollar, and in the alternative, argues that Plaintiff failed to produce evidence to support its claim of actual damages from Defendant's tortious interference with Plaintiff's Agreement with Rowland. The argument as to the verdict of one dollar, however, was not asserted by Plaintiff as grounds for judgment in its favor under Rule 50(a). See generally Price v. City of Charlotte, 93 F.3d 1241, 1249 (4th Cir. 1996) ("[A] Rule 50(a) motion is a prerequisite to a Rule 50(b) motion because the [party] must apprise the district court of the alleged insufficiency of [the non-moving party's] suit before the case is submitted to the jury."). Defendant's failure to assert there was insufficient evidence to support a jury verdict of one dollar under Rule 50(a) is clearly because such an argument cannot be made under Rule 50(a) or (b). A motion for judgment as a matter of law is appropriate when there is an absence of evidence on an issue essential to the non-moving party's cause of action or defense, Fed. R. Civ. P. 50(a)(1), or where there are discrete legal issues that can be resolved as a matter of law, Chesapeake Paper Prods. Co. v. Stone &

Webster Eng'g Corp., 51 F.3d 1229, 1236 (4th Cir. 1995).  The fact that damages are not equal to a specific amount is not an essential element of a tortious interference with contract claim, see Embree Constr. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992) (listing the elements of tortious interference with contract), and is not a discrete legal issue relevant to the claim, Chesapeake Paper Prods., 51 F.3d at 1236 (noting that whether the contract governed the rights and liabilities of the parties could have been addressed by a Rule 50 motion).  Therefore, a party is not entitled to judgment as a matter of law on a claim for tortious interference with contract if the non-moving party cannot show damages are equal to one dollar.  As a result, the Court denies Defendant's request for judgment as a matter of law on this basis.[4]

Next, the Court assesses whether Plaintiff produced sufficient evidence to support the element of actual damages for the tortious interference with contract claim.  In a claim for tortious inference with contract, plaintiff has the burden of proving actual damages, Olivetti Corp. v. Ames Bus. Sys., Inc., 319 N.C. 534, 547, 356 S.E.2d 578, 586 (1987), but how plaintiff shows and determines the resulting actual damages varies based on the facts of the case, Static Control Components, Inc., 200 F. Supp. 2d at 549 (citing Byrd's Lawn & Landscaping v. Smith, 142 N.C. App. 371, 378, 542 S.E.2d 689, 693 (2001)).  The North Carolina Court of Appeals has recognized that "breach of non-competition agreements . . . necessarily involves damages which are difficult to calculate with absolute precision" and the "indefiniteness consequent upon this difficulty does not, however, by itself preclude relief[.]"  Keith v. Day, 81 N.C. App. 185, 196, 343 S.E.2d 562, 569 (1986) (citation omitted).  Therefore, "[w]hat the law does require in cases of this character is

---

[4] Defendant did not moved for a new trial under Rule 59(a) on account of the one dollar verdict for the tortious interference with contract claim.

that the evidence shall with a fair degree of probability establish a basis for the assessment of damages." Id. (citations omitted); see also Southern Bldg. Maint., Inc., v. Osborne, 127 N.C. App. 327, 332, 489 S.E.2d 892, 896 (1997) ("While the reasonable certainty standard requires something more than 'hypothetical or speculative forecasts,' it does not require absolute certainty."). Here, Plaintiff produced evidence of costs associated with retaining new employees to fulfill the obligations and duties previously performed by Rowland and of costs associated with litigation against Rowland to enforce the Agreement. This evidence provided a basis for the assessment of damages with a sufficient degree or probability from which a reasonable jury could conclude the existence of actual damages and determine the amount of actual damages. Accordingly, the Court denies Defendant's motion for judgment as a matter of law on Plaintiff's claim for tortious interference with the Agreement.

### c. Trade Secrets

As discuss previously, supra § II (A)(1)(a), this Court has already concluded that Plaintiff disclosed the trade secrets at issue in this case. Defendant has not argued that there was false evidence or insufficient evidence for the jury to consider whether Plaintiff's customer lists and contact information, customer functional requirement documents, process manuals, interface screens, interface files, customer health information, or back-end of Deathstar, were trade secrets, and if so, if any of them were misappropriated. The records also does not support such an argument. Accordingly, the Court did not err in instructing the jury to consider such.

### d. North Carolina Trade Secrets Protection Act

Defendant argues that the Court erred by instructing the jury that it could find Defendant liable under the North Carolina Trade Secrets Protection Act ("NCTSPA") under an agency theory

because NCTSPA does not permit liability under an agency theory.  Even if the agency theory applies, Defendant argues judgment should be entered in its favor because no substantial evidence supports a finding that Rowland acted as Defendant's agent as to the misappropriation.[5]  On these grounds, Defendant seeks a new trial or judgment as a matter of law it its favor.

### i. Liability of Principal under the NCTSPA

As the NCTSPA contains no clause preempting the application of other law,[6] the question before the Court is: does the prima facie requirement of substantial evidence that Defendant—the person relief is sought against—"[k]nows or should have known of the trade secret" preclude Defendant's liability under agency theory for the acts—the misappropriation—of its agent Rowland.  To address this question, the Court first analyzes the NCTSPA and then the law on agency, as espoused by North Carolina appellate courts.  See generally Askew v. HRFC, LLC, 810 F.3d 263, 266 (4th Cir. 2016) (holding that when the case involves solely state-law matters, the court's "role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue" (internal citations omitted)).

The NCTSPA states that "[t]he owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret."  N.C. Gen. Stat. § 66-153.  To obtain this remedy, the owner of the trade secret must set forth a prima facie case through:

> the introduction of substantial evidence that the person against whom relief is sought both:
> (1)  Knows or should have known of the trade secret; and

---

[5] Defendant also argues that substantial evidence does not support a finding of use or acquisition by Defendant of the trade secrets.  However, as discussed later in this order, the jury, abiding by the instructions, concluded Defendant's agent misappropriated Plaintiff's trade secrets, which made Defendant liable under agency theory, but Defendant, as a legal entity separate and apart from its agent, did not acquire or use Plaintiff's trade secret.  Because the jury did not find that Defendant used or acquired Plaintiff's trade secrets, Defendant's objection is moot.

[6] Contra Infinity Prods., Inc. v. Quandt, 810 N.E.2d 1028, 1033-34 (Ind. 2004) (holding that the common law doctrine of *respondent superior* did not apply because the legislature codified that "[t]he chapter displaces all conflicting law of this state pertaining to the misappropriation of trade secrets, except contract and criminal law").

(2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.

N.C. Gen. Stat. § 66-155. Person is defined as "an individual, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, association, joint venture, or any other legal or commercial entity." N.C. Gen. Stat. § 66-152(2). Upon a finding of misappropriation, which is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent[,]" N.C. Gen. Stat. § 66-152(1), the owner may be entitled to a permanent injunction, actual damages, punitive damages, and reasonable attorneys' fees. N.C. Gen. Stat. § 66-154. However, even after a judgment finding misappropriation is entered,

a person who in good faith derives knowledge of a trade secret from or through misappropriation or by mistake, or any other person subsequently acquiring the trade secret therefrom or thereby, shall be enjoined from disclosing the trade secret, but no damages shall be awarded against any person for any misappropriation prior to the time the person knows or has reason to know that it was a trade secret.

N.C. Gen. Stat. § 66-154(a)(2).

Under North Carolina law, "[t]he two essential elements of an agency relationship are: (1) the authority of the agent to act on behalf of the principal, and (2) the principal's control over the agent." State v. Weaver, 359 N.C. 246, 258, 607 S.E.2d 599, 606 (2005) (citing Holcomb v. Colonial Assocs., 358 N.C. 501, 509, 597 S.E.2d 710, 716 (2004)). Both parties, the agent and principal, must "consent that the agent will act on behalf of the principal in a particular capacity." Id. (citing Ellison v. Hunsinger, 237 N.C. 619, 628, 75 S.E.2d 884, 891 (1953)). "Whether a principle-agent relationship exists is a question of fact for the jury when there is evidence tending

to prove it; it is a question of law for the court if only one inference can be drawn from the facts." Smock v. Brantley, 76 N.C. App. 73, 75, 331 S.E.2d 714, 716 (1985) (citation omitted).

A principal is liable for the torts of his agent (1) "when expressly authorized," (2) "when ratified by the principal," or (3) "when committed within the scope of his employment and in furtherance of his master's business." See e.g., Snow v. De Butts, 212 N.C. 120, 122, 193 S.E. 224, 226 (1937). "In the first two of these three situations, liability is based upon traditional agency principles; in the third of these three situations, liability is based upon the doctrine of *respondeat superior*." Creel v. North Carolina Dept. of Health, 152 N.C. App. 200, 202-03, 566 S.E.2d 832, 833 (2002) (citations omitted).

Because corporations, and other legal entities, only have knowledge through its agents and can only act through its agents, the NCTSPA cannot be construed to disallow liability under agency principals. "[A] corporation is liable civiliter for torts committed by its servants or agents precisely as a natural person. Though it may have no mind with which to plot a wrong or hands capable of doing an injury, yet it may employ the minds and hands of others." Dickerson v. Atl. Refining Co., 201 N.C. 90, 99, 159 S.E. 446, 452 (1931); see Woodson v. Rowland, 329 N.C. 330, 344, 407 S.E.2d 222, 231 (1991) ("A corporation can act only through its agents . . . ."); Sledge Lumber Corp. v. S. Builders Equip. Co., 257 N.C. 435, 439, 126 S.E.2d 97, 100 (1962) (holding that executives' position "was such that his acts and knowledge would be the acts and knowledge of the corporation which can act only through its agents"); see also St. Paul Mercury Ins. Co. v. Am. Bank Holdings, Inc., 819 F.3d 728, 734 (4th Cir. 2016) ("Because a corporation is a fiction that can have knowledge only through its agents, knowledge of an agent acquired within the scope of the agency relationship is imputable to the corporation." (applying Maryland law)). Construing

NCTSPA to preclude the application of agency theory would shield legal entities such as limited liability companies and corporations from liability under the NCTSPA.[7] This is inconsistent with the language of the NCTSPA, which defines person to include a "corporation . . . or any other legal or commercial entity." N.C. Gen. Stat. § 66-152(2). North Carolina appellate courts have also affirmed rulings holding corporations and limited liability companies liable under NCTSPA for the acts of their employee agents. For example, the North Carolina Court of Appeals affirmed a claim against a limited liability company where the trial court sitting as fact finder found that defendant's employees "knew of [Plaintiff's] trade secrets and had access to them, and each had the opportunity to acquire them for disclosure and use." Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC., 174 N.C. App. 49, 57-58, 620 S.E.2d 222, 229 (2005). Therefore, the NCTSPA does permit liability based upon an agency theory, and the jury instructions as a whole adequately state the controlling law on this matter. Defendant is not entitled to a new trial or judgment as a matter of law on these grounds.

## ii. Evidence

The Court next considers whether Defendant is entitled to judgment as a matter of law under Rule 50(b) because of a lack of evidence supporting that Rowland misappropriated as Defendant's agent. Defendant contends there is no substantial evidence that Defendant "expressly authorized" or "ratified" Rowland's misappropriation or that the misappropriation was "committed within the scope of [Rowland's] employment and in furtherance of [Defendant's] business." (Doc.

---

[7] See generally Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1430-31 (3d. Cir. 1994) ("[C]ourts imposing liability on agency theories are not expanding the category of affirmative conduct proscribed by the relevant statute; rather, they are deciding on whose shoulders to place responsibility for conduct *indisputably proscribed* by the relevant statute. . . Indeed, in some instances, liability cannot be imposed without reference to agency principles -- a corporation can only act through its agents, and therefore only can be bound through application of agency principles.").

No. 125 at 14 (quoting <u>Medlin v. Bass</u>, 327 N.C. 587, 592, 398 S.E.2d 460, 463 (1990)). The Court disagrees. Although there is no direct evidence that Defendant told or ordered Rowland to misappropriate Plaintiff's trade secrets, there is sufficient evidence, combined with the instruction on spoliation, for a reasonable jury to conclude that Rowland misappropriate as Defendant's agent under either of the three prongs.

"Unless there is but one inference that can be drawn from the facts, whether an agency relationship exists is a question of fact for the jury." <u>Hylton v. Koontz</u>, 138 N.C. App. 629, 635, 532 S.E.2d 252, 257 (2000). "An agency can be proved 'generally, by any fact or circumstance with which the alleged principal can be connected and having a legitimate tendency to establish that the person in question was his agent for the performance of the act in controversy . . . .'" <u>Colony Assoc. v. Fred L. Clapp & Co.</u>, 60 N.C. App. 634, 638, 300 S.E.2d 37, 39 (1983) (citation omitted). Expressly authorized does "not meant authority expressly conferred; but that the act was such as was incident to the performance of the duties entrusted to him by the master[.]" <u>West v. F.W. Woolworth Co.</u>, 215 N.C. 211, 214, 1 S.E.2d 546, 548 (1939). Ratification occurs when "the principal had knowledge of all material facts and circumstances relative to the wrongful act, and that the [principal], by words or conduct, show[ed] an intention to ratify the act." <u>Walker v. Sloan</u>, 137 N.C. App. 387, 397, 529 S.E.2d 236, 244 (2000) (citations omitted) (internal quotations omitted) (alterations in original). "Ratification may be express or implied, and intent may be inferred from failure to repudiate an unauthorized act[.]" <u>Id</u>. (citation omitted). "An act is within the scope of the servant's employment where necessary to accomplish the purpose of his employment and intended for that purpose, although in excess of the powers actually conferred upon the servant by the master." <u>West</u>, 215 N.C. at 214, 1 S.E.2d at 548. "'In the furtherance of

the business of the employer' means simply in the discharge of the duties of the employment." Id. (citations omitted). Thus, "[w]hen . . . the employee is undertaking to do that which he was employed to do and, in so doing, adopts a method which constitutes a tort and inflicts injury on another[,]" the master is liable. Lee v. United States, 171 F. Supp. 2d 566, 574 (M.D.N.C. 2001) (quoting Clemmons v. Life Ins. Co. of Georgia, 274 N.C. 416, 422, 163 S.E.2d 761, 766 (1968)).

Here, the jury found in the affirmative by a preponderance of evidence that Defendant, or an agent of Defendant, misappropriated at least one of Plaintiff's trade secrets and found damages of $600,000. (Doc. No. 106 at 3-4). On the misappropriation of trade secrets claim, the jury was instructed on the definition of misappropriation and the relationship of agency. Testimony showed that Rowland backed up confidential information from his Legacy work computer to a SD card after receiving an oral offer for employment from Defendant and submitting his two week notice to Plaintiff. Rowland had not backed up his data on these devices for the past eight months. Plaintiff's data was automatically backed up, and Plaintiff had a policy against employees' unilaterally backing up their data. Rowland did not return the SD card on his last day of work and possessed the SD card when he starting work for Defendant. Defendant felt it would be imprudent if Plaintiff knew that it hired Rowland and efforts to keep Rowland's employment by Defendant secret were proposed and discussed. Rowland testified that he did not tell his colleagues at Legacy Data of his offer. Plaintiff and Defendant are competitors; both are in the health care date archive business. Defendant decided not to hire other former employees of Plaintiff because they had non-competes. Defendant initiated a new policy upon hiring Rowland of requiring employees to represent their lack of conflicts with former employers. Rowland affirmed this representation upon beginning his employment, when he in fact was subject to the Agreement and possessed the SD

card. Defendant permitted Rowland to work from home full time. Rowland was the only data modeler permitted to work from home full time. Rowland had his personal computer and SD card at his home. Rowland used software to delete and remove any forensic evidence of over a thousand files from his personal computer in close proximity to material events in the lawsuits brought by Plaintiff. Testimony also showed that Defendant continued to employ Rowland and to voluntarily pay his attorneys' fees after Defendant learned of (i) Rowland's non-compete, (ii) Plaintiff's suit against Rowland, (iii) Rowland's possession of Plaintiff's information, and (iv) Rowland's deletion of potentially relevant data. When Defendant learned of Rowland's non-compete, Rowland was still in his 90-day probationary period. Rowland was and remained at the time of trial an at-will employee. Defendant had only paid the attorneys' fees for one other employee prior to paying for Rowland's attorneys' fees. Defendant's president considered Rowland a middle of the pack employee. Testimony and evidence was also presented supporting spoliation of evidence, which allows an adverse inference against Defendant if found by the jury. Given this testimony and evidence, the Court cannot conclude that the "only conclusion a reasonable trier of fact could draw from the evidence is in favor of [Defendant,]" Tools USA and Equip. Co., 87 F.3d at 656-57, and denies Defendant's request for judgment as a matter of law in its favor.

### e. Spoliation Instructions

Defendant argues that the Court erred by allowing an instruction on spoliation of evidence. Imposing sanctions for spoliation of evidence is an inherent power of the court that is governed by federal law. Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 449 (4th Cir. 2004) (quoting Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir.2001)). However, the inherent power is limited

to what is "necessary to redress conduct 'which abuses the judicial process.'" Silvestri, 271 F.3d at 590 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)).

"Ordinary agency principles govern a party's responsibility for spoliation committed by its employees." Nucor Corp. v. Bell, 251 F.R.D. 191, 196 (D.S.C. 2008) (citing Valentine v. Mercedes-Benz Credit Corp., No. 98 CIV. 1815(MBM), 1999 WL 787657, at *4 (S.D.N.Y. 1999)). Therefore, spoliation by the employer occurs if at the time of destruction or alteration of evidence, the employer's agent, as defined by agency principals previously discussed, had a duty to preserve the evidence, the evidence was relevant to the litigation, and the party acted with the requisite intent. See id. at 194. "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." Silvestri, 271 F.3d at 591 (citing Kronisch v. United States, 150 F.3d 112, 126 (2d Cir.1998)). For an adverse inference against the party based on spoliation, the intent required is willful conduct resulting in the evidence's destruction. Nucor Corp., 251 F.R.D. at 194 (citing Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995)).[8] Bad faith is not required to impose the sanction of an adverse inference. Id. at 194 (citing Hodge, 360 F.3d at 450). Rather, willful conduct is established if the party intended "to take those actions that caused the evidence's alteration or destruction." Nucor Corp., 251 F.R.D. at 198 (citing Vodusek, 71 F.3d at 156).

---

[8] Defendant cites Rule 37(e)(2) of the Federal Rules of Civil Procedure for the proposition that Plaintiff must show that Defendant "acted with intent to deprive" Plaintiff of Electronically Stored Information ("ESI"). Fed. R. Civ. P. 37(e)(2) ("[T]he court . . . only upon a finding that the party acted with intent to deprive another party of the information's use in the litigation may: . . . instruct the jury that it may or must presume the information was unfavorable to the party[.]"). However, as clarified in the notes of the advisory committee to the 2015 amendment, this provision "applies only when [ESI] is lost" "because the party failed to take reasonable steps to preserve the information." This case involves the destruction of ESI, not the loss of ESI. Therefore, Rule 37(e)(2) is inapplicable.

As many other district courts have done, the Court concluded that sufficient evidence supported allowing the jury to assess the evidence and determine whether spoliation occurred. See Nucor Corp., 251 F.R.D. at 203 (discussing how courts routinely allow the jury to decide whether spoliation occurred). Defendant argues that this was improper because there was no evidence that "MediQuant knew or should have known about any alleged failure by Rowland and/or Mr. Shipe to preserve electronically stored information" (Doc. No. 127 at 15) and MediQuant did not have control over Rowland's SD card or computer. Yet, specific knowledge that an act would be committed by the agent is not required for an agency relationship to arise. West, 215 N.C. at 214, 1 S.E.2d at 548-49 ("When a wrong is committed by an employee in performing or attempting to perform the duties and functions of his employment it is immaterial whether the injury was a result of negligence or willful and wanton conduct; nor is it necessary that the master should have known that the particular act was to be done."). Also, there was evidence presented showing that Defendant learned of the spoliation. Similarly, control over the ESI—the data on the SD card or the computer—is not required for an agency relationship. Instead, the agent must have authority to act on behalf of the principal and the principal must have "*control over the agent*." See e.g., Weaver, 359 N.C. at 259, 607 S.E.2d at 606 (emphasis added). The principal is liable for the act of its agent if the act was authorized by the principal, ratified by the principal, or within the agent's employment and in furtherance of the principal's business. See Matthews v. Food Lion, LLC, 205 N.C. App. 279, 281-82, 695 S.E.2d 828, 830 (citing Snow, 212 N.C. at 122, 193 S.E. at 226).

As previously summarized, in addition to the other circumstantial evidence and testimony of the relationship between Defendant and Rowland, Defendant at the time of the trial continued to employ Rowland and paid his attorneys' fees, including the fees of Shipe, despite learning of

Rowland and Shipe's destruction of evidence. Rowland had also informed Defendant's president about his non-compete prior to the destruction of evidence. Thus, there is evidence supporting an instruction of spoliation against Defendant, through someone acting as its agent. Further, the sanction of spoliation instruction was necessary to level the evidentiary playing field. See Vodusek, 71 F.3d at 156. Defendant used the absence of documents and data, created by Rowland and Shipe, to its advantage in its arguments at trial and before trial. Therefore, the Court did not err by instructing the jury on spoliation of evidence. Defendant has also not addressed how the instructions, as a whole, fail to adequately state the controlling law. Accordingly, Defendant has stated no basis for a new trial.

## B. Defendant's Post-Trial Motion under Rule 49(b)

Defendant requests that the Court enter judgment notwithstanding the general verdict on Plaintiff's NCTSPA claim under Rule 49(b)(3)(A) because the jury's answers to the special interrogatories on Plaintiff's unfair or deceptive trade practices claim are inconsistent with the general verdict on Plaintiff's NCTSPA claim. Specifically, Defendant contends the jury's answer in the affirmative to the question "Did Defendant misappropriate any of the trade secrets of Plaintiff?" for the NCTSPA claim contradicts the special interrogatories that answer in the negative the questions "Did defendant . . . [a]quire Plaintiff's trade secrets[?]" and "Did defendant . . . [u]se Plaintiff's trade secrets[?]" for the unfair or deceptive trade practice claim. Plaintiff, in response, argues that the answers are not inconsistent and that Defendant has waived its ability to move under Rule 49(b) by failing to raise the inconsistency before the discharge of the jury.

As explained by the Fourth Circuit:

Rule 49(b) permits a district court to "submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact

the decision of which is necessary to a verdict." Fed. R. Civ. P. 49(b). The Rule contemplates three scenarios that may result from such an approach, and provides the district court with corresponding courses of action. First, if the general verdict and the interrogatory answers are harmonious, "the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58." Id. Second, if the interrogatory answers are consistent with each other but one or more is inconsistent with the general verdict, the district court may enter judgment in accordance with the interrogatory answers notwithstanding the general verdict, return the jury for further consideration of its interrogatory answers and general verdict, or order a new trial. Third, if the interrogatory answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the district court is prohibited from entering judgment, but may order a new trial or return the jury for further consideration of its interrogatory answers and general verdict.

Austin v. Paramount Parks, Inc., 195 F.3d 715, 725 (4th Cir. 1999). The Fourth Circuit in Austin reiterated and reaffirmed that because "the purpose of Rule 49(b) is 'to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without the need for another presentation of the evidence to a new body,'" Rule 49(b) "obligates a party 'to object to any asserted inconsistencies in the response to jury interrogatories prior to the discharge of the jury[.]'" Id. at 725 (quoting White v. Celotex Corp., 878 F.2d 144, 146 (4th Cir. 1989)). Therefore, the Court held that a moving party's failure to raise the inconsistency before the jury was discharged bars a motion under Rule 49(b) regardless of the relief sought, new trial or entry of judgment. Id. at 726.

Defendant concedes that it failed to raise the inconsistency but argues that there is no waiver if "the judge does not ask if the parties object to the verdict before discharging the jury, and the issue arises in post-trial briefing." (Doc. No. 141 at 1 (citing Hundley v. District of Columbia, 494 F.3d 1097, 1103 (D.C. Cir. 2007)). However, the binding Fourth Circuit precedent in Austin does not support this proposition. In Austin, the trial court did not expressly ask if the parties object to the verdict; instead, the trial court merely asked the parties "[i]f there is nothing

before we dismiss the jurors?'" <u>Austin</u>, 195 F.3d at 724. Both parties responded "No, Your Honor," and the court proceeded to inform the jurors that they were discharged. <u>Id</u>. Similarly, here, after the Clerk of Court published the verdict, the Court[9] asked the parties "[a]nything from either side at this time?" (Rough Trial Tr., July 27, 2017, 6:18-19). Counsel for Defendant responded, "Your Honor, the defendants would just ask to poll the jury briefly." (Rough Trial Tr., July 27, 2017, 6:20-21). Defendant did not state any further objection, and after the polling of the jury, the Court thanked the jury for their service and discharged them. Therefore, under Fourth Circuit precedent, Defendant is barred from moving under Federal Rule of Civil Procedure 49(b) for failing to object to the inconsistent verdict.

Further, the Court finds that the answers are not inconsistent and can be reconciled. Courts "[are] obligated to harmonize inconsistencies in a jury's responses on a special verdict form, if it is possible to do so." <u>Figg v. Schroeder</u>, 312 F.3d 625, 642 (4th Cir. 2002). Here, the Court instructed the jury on agency theory for the claim of misappropriation of trade secrets and instructed the jury to answer yes to the question "Did Defendant misappropriate any of the trade secrets of Plaintiff?" (Doc. No. 106 at 4) if it concluded "defendant, or an agent of defendant, misappropriated plaintiff's trade secrets" (Rough Trial Tr., July 25, 2017, 212:10-13, 215:14-18). In contrast, as to Plaintiff's claim for unfair or deceptive trade practices, the Court did not instruct the jury on agency theory and instead stated that a finding of acquiring or using Plaintiff's trade secrets required Plaintiff to prove by a preponderance of evidence that "defendant committed at least one of" the listed acts. (Rough Trial Tr., July 25, 2017, 219:12). Therefore, the jury, abiding by the instructions, reasonably concluded Defendant's agent misappropriated Plaintiff's trade

---

[9] The Honorable Max O. Cogburn, Jr. presided over the taking of the verdict in the undersigned's absence.

secrets, which made Defendant liable under agency theory, but Defendant as a legal entity separate and apart from its agent did not acquire or use Plaintiff's trade secret. As a result, Defendant's motion under Rule 49(b) also fails on the merits, and the Court denies Defendant's Post-Trial Motion under Rule 49(b).

## C. Defendant's Remaining Post-Trial Motion under Rule 50(b)

### 1. Non-Competition Provisions of Agreement

#### a. Applicable Law

Defendant contends that the Agreement's non-competition provision is unenforceable as a matter of law, entitling Defendant to judgment as matter of law for Plaintiff's claim for tortious interference with the Agreement.[10] Defendant first argues that the choice-of-law provision in the Agreement should be disregard and North Carolina law applied. Defendant contends that the enforcement of the non-competition provision would contravene well-settled North Carolina law, and as a result, public policy precludes the application of the choice-of-law provision and the enforcement of the non-competition provision.

When sitting in diversity jurisdiction, federal courts must apply the conflict of law rules of the state in which they sit. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). For contract claims, North Carolina courts adhere to *lex loci contractus*, "the law of the place where the contract was made." Tanglewood Land Co. v. Byrd, 299 N.C. 260, 261 S.E.2d 655, 656 (1980) (citing Bundy v. Commercial Credit Corp., 200 N.C. 511, 516, 157 S.E. 860, 863 (1931); Fast v. Gulley, 271 N.C. 208, 155 S.E. 2d 507 (1967)). However, the Supreme Court of North Carolina

---

[10] To satisfy the first element of a claim for tortious interference with contract under North Carolina law, a plaintiff must produce evidence of a "valid and enforceable" "contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person[.]" United Labs., 322 N.C. at 661-62, 370 S.E.2d at 387 (1988). Neither party disputes that North Carolina law governs the tort claims in this case.

has held that "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." A.E.P. Indus., Inc. v. McClure, 308 N.C. 393, 402, 302 S.E.2d 754, 760 (1983) (quoting Tanglewood, 299 N.C. at 262, 261 S.E.2d at 656). The North Carolina Supreme Court in McClure applied the law agreed to by the parties to assess the validity and enforceability of a non-competition provision. Id. Therefore, lower courts have considered themselves bound to apply the agreed to law "as long as [the contracting parties] had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental public policy of the state or otherwise applicable law." Sawyer v. Mkt. Am., Inc., 190 N.C. App. 791, 794, 661 S.E.2d 750, 752 (2008) (quoting Torres v. McClain, 140 N.C. App. 238, 241, 535 S.E.2d 623, 625 (2000)).

Defendant reasons that North Carolina public policy precludes enforcement of non-competition provisions that would not be enforceable under "well-settled" North Carolina law when the party asserts a claim under North Carolina law of tortious interference with contract. Therefore, Defendant argues that to determine the validity of the Agreement for Plaintiff's claim of tortious interference with contract, the law of North Carolina instead of the law chosen by Rowland and Plaintiff—Georgia—governs the Agreement. Defendant, however, has not cited any North Carolina precedent or statutory language supporting that this is the public policy of North Carolina. Defendant's argument also overlooks the distinction been a "fundamental public policy" and "well-settled" law. The North Carolina Supreme Court has specifically held:

> [T]he mere fact that the law of the forum differs from that of the other jurisdiction does not mean that the foreign statute is contrary to the public policy of the forum. Bradford Electric Light Co. v. Clapper, 286 U.S. 145, 76 L.Ed. 1026 (1932). To render foreign law unenforceable as contrary to public policy, it must violate some prevalent conception of good morals or fundamental principle of natural justice or involve injustice to the people of the forum state. Ellison v. Hunsinger, 237 N.C.

619, 75 S.E. 2d 884 (1953); <u>Howard v. Howard</u>, 200 N.C. 574, 158 S.E. 101 [(1931)].

<u>Boudreau v. Baughman</u>, 322 N.C. 331, 342, 368 S.E.2d 849, 857-58 (1988); <u>see</u> <u>generally</u> <u>Bueltel v. Lumber Mut. Ins. Co.</u>, 134 N.C. App. 626, 631, 518 S.E.2d 205, 209 (1999) ("Choice of law provisions are not contrary to the laws of this state."). Therefore, the Court reaffirms its previous decision that the validity of the non-competition provision in the Agreement is determined under Georgia law.

### b. Enforceability of Non-Competition Provision

Defendant next contends that the non-competition provision is not valid under Georgia law. Specifically, Defendant contends that the non-competition provision is not reasonable as to geographic area. Plaintiff, meanwhile, acknowledges that there is no limitation as to geographic scope but contends the listing of particular competitors as prohibited employers renders the non-competition provision enforceable. Further, Plaintiff argues that the non-competition provision, even if void, may be modified by the Court to protect the interests and intent of the contracting parties.

Under Georgia law, restrictive covenants restricting competition are permitted if "reasonable in time, geographic area, and scope of prohibited activities[.]" Ga. Code Ann. § 13-8-53(a). "Whether the restraint imposed by the employment contract is reasonable is a question of law for determination by the court, which considers the nature and extent of the trade or business, the situation of the parties, and all other circumstances." <u>W.R. Grace & Co., Dearborn Div. v. Mouyal</u>, 262 Ga. 464, 465, 422 S.E.2d 529, 531 (1992) (citations omitted) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Early v. MiMedx Grp., Inc.</u>, 330 Ga. App. 652, 660, 768 S.E.2d 823, 829 (2015).

Although both parties cite section 13-8-56 as supporting their view that the non-competition provision is or is not reasonable as to geographic area, the Court concludes that this statute, which creates a presumption of reasonableness, is not determinative of the issue before the Court. Section 13-8-56 provides that courts "[i]n determining the reasonableness of a restrictive covenant that limits or restricts competition during or after the term of an employment or business relationship, the court shall make the following presumptions . . . ." The presumption applicable to the reasonableness of geographic area is:

> (2) A geographic territory which includes the areas in which the employer does business at any time during the parties' relationship, even if not known at the time of entry into the restrictive covenant, is reasonable provided that:
>> (A) The total distance encompassed by the provisions of the covenant also is reasonable;
>> (B) The agreement contains a list of particular competitors as prohibited employers for a limited period of time after the term of employment or a business or commercial relationship; or
>> (C) Both subparagraphs (A) and (B) of this paragraph[.]

Ga. Code Ann. § 13-8-56(2). Under Georgia law, "[t]he fundamental rules of statutory construction require [courts] to construe a statute according to its terms, to give words their plain and ordinary meaning, and to look diligently for the intention of the General Assembly." <u>Atlanta Indep. Sch. Sys. v. Atlanta Neighborhood Charter. Sch., Inc.</u>, 293 Ga. 629, 631, 748 S.E.2d 884, 886 (2013) (citing Ga. Ann. Code § 1-3-1(a); <u>Slakman v. Continental Cas. Co.</u>, 277 Ga. 189, 190, 587 S.E.2d 24, 26 (2003)). Here, the non-competition provision does not "contain[] a list of particular competitors as prohibited employers[.]" Ga. Code Ann. § 13-8-56(2). Instead, the non-competition provision prohibits Rowland from performing services "for MediQuant, Incorporated, *or any other direct competitor* of [Plaintiff] which may later be identified by Company in writing to Employee during the term of Employee's employment of Company." (Doc. No. 125 at 6

(emphasis added)).  The word particular is an adjective "used to single out an individual member of a specified group or class."  <u>See</u> Particular Definition, Oxford Dictionary, http://premium.oxforddictionaries.com/us/english/ (list visited Nov. 15, 2017).  Therefore, the plain meaning of the requirement "a list of particular competitors" cannot be met by general limitations to "any direct competitor."  Instead, the provision must only contain names identifying the prohibited competitors; vague generalities will not met the requirement for a presumption under section 13-8-56 of the Georgia Code.  Further, adopting the construction of the statute that allows vague generalities like the one in the Agreement would be contrary to "the General Assembly['s] desire[] to provide statutory guidance so that all parties to such agreements may be certain of the validity and enforceability of such provisions and may know their rights and duties according to such provisions."  Ga. Code Ann. § 13-8-50.  The provision in the Agreement allows Plaintiff to unilaterally identify competitors at any time prior to the end of Rowland's employment.  Rowland would have no certainty as to his duties and rights until his employment ended.  Thus, the Court concludes without a complete list of *particular* prohibited competitors *in the Agreement*, section 13-8-56 is inapplicable, and no presumption of reasonableness arises.

Without an applicable presumption on geographic territory, the Court considers whether the non-competition agreement is "reasonable in time, geographic area, and scope of prohibited activities[.]"  Ga. Code Ann. § 13-8-53.  The Court first must construe the non-competition provision "to comport with the reasonable intent and expectations of the parties to the covenant and in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement."  Ga. Code Ann. § 13-8-54(a).  Legitimate business interests include the protection of "trade secrets, valuable confidential information, substantial relationships

with specific prospective or existing customers, customer goodwill, and extraordinary or specialized training[.]" Acuity Brands, Inc. v. Bickley, No. 13-366-DLB-REW, 2017 WL 1426800, at *11 (E.D. Ky. Mar. 31, 2017) (citing Ga. Code Ann. § 13-8-51(9)). Here, Plaintiff did not exercise its right to add prohibited employers and instead the non-competition provision in fact only limited Rowland from performing any services for Defendant. The Court concludes that the plain language of the non-competition provision reflects that Plaintiff and Rowland intended to prohibit Rowland from working for Plaintiff's competitor MediQuant anywhere for one year.

The Court also concludes the statutory language requiring restrictions on competition to be "reasonable in time, geographic area, and scope of prohibited activities[,]" Ga. Code Ann. § 13-8-53(a), does not require an express geographic limitation in a non-competition provision. "[S]tatutory construction require[s] [courts] to construe a statute according to its terms, to give words their plain and ordinary meaning, and to look diligently for the intention of the General Assembly." Atlanta Indep. Sch. Sys., 293 Ga. at 631, 748 S.E.2d at 886 (citations omitted). To accomplish this, the court "may look to other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question. May v. State, 295 Ga. 388, 391-92, 761 S.E.2d 38, 41 (2014) (internal citations omitted).

Under the common law of Georgia, "[a] covenant not to compete, being in partial restraint of trade, is not favored in the law, and will be upheld *only when strictly limited in* time, territorial effect, the capacity in which the employee is prohibited from competing and when it is otherwise reasonable." Beckman v. Cox Broad. Corp., 250 Ga. 127, 129, 296 S.E.2d 566, 568 (1982) (citing Howard Schultz & Assoc. v. Broniec, 239 Ga. 181, 183, 236 S.E.2d 265, 267 (1977); Rollins

Protective Servs. Co. v. Palermo, 249 Ga. 138, 287 S.E.2d 546 (1982)).  However, the common law has been superseded for contracts entered after May 11, 2011 by an amendment to the Georgia Constitution and the enactment of the Restrictive Covenant Act.  See Restrictive Covenant Act, 2011 Ga. Laws 99 (codified at Ga. Code Ann. §§ 13-8-2 to -59).  When enacting the Restrictive Covenant Act, "[t]he General Assembly [found] that reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interest and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state."  Ga. Code Ann. § 13-8-50.

The Restrictive Covenant Act, as codified in section 13-8-53, requires restrictions on competition to be "reasonable in time, geographic area, and scope of prohibited activities" to be enforceable.  Ga. Code Ann. § 13-8-53(a).  Although the statutory language reflects the consideration of the time, territorial effect, and scope of prohibited capacities like the common law, the statutory language does not require *strict limitations* in these categories in addition to the *overall reasonableness* of the restrictive covenant.  See generally Summerlin v. Ga. Pines Cmty. Serv. Bd., 286 Ga. 593, 594, 690 S.E.2d 401, 402 (2010) ("The General Assembly is presumed to enact all statutes with full knowledge of the existing condition of the law and with reference to it." (citation omitted)).  The legislature's departure from the common law language, combined with the plain language of the phrase "reasonable in time, geographic area, and scope of prohibited activities," Ga. Code Ann. § 13-8-53(a), indicates that the categories of time, geographic area, and scope can be assessed for reasonableness as whole.  This construction is also necessary for the Court "to reconcile . . . any potential conflicts between different sections of the same statute, so as to make them consistent and harmonious" and "to give 'sensible and intelligent effect' to all of its

34

provisions." Sikes v. State, 268 Ga. 19, 21, 485 S.E.2d 206, 208 (1997) (citation omitted). The statute clarifies that for one restriction on competition—restrictions on solicitation—"[n]o express reference to geographic area . . . shall be required in order for the restraint to be enforceable[,]" Ga. Code Ann. § 13-8-53(b). Although there is no similar clarification for non-competition provisions, both non-solicitation provisions and non-competition provisions are contractual restrictions on competition that must be "reasonable in time, geographic area, and scope of prohibited activities" to be enforceable under section 13-8-53 (a) of the Georgia Code. Thus, the phrase "reasonable in time, geographic area, and scope of prohibited activities" cannot be construed as requiring an express geographic limitation without conflicting with the express language in subsection (b) on restrictions on solicitation. Therefore, to "reconcile . . . any potential conflicts," give "sensible and intelligent effect" to all the provisions of the statute, and to reflect the legislative intent, the Court concludes that "reasonable in time, geographic area, and scope of prohibited activities" cannot be construed to require an express geographic term to be reasonable and enforceable.

After review of the trial record, the Court also concludes that the prohibition on providing services for Defendant for one year is "reasonable in time, geographic area, and scope of prohibited activities." Plaintiff had other competitors, but Defendant was Plaintiff's main competition. Plaintiff previously had dominated the market but over the years the market has become more crowded and competitive. Plaintiff and Defendant competed for the business of hospitals throughout the nation. Insight into Plaintiff's operation and access to their trade secrets and confidential information would be beneficial to a competing entity. Plaintiff's margins are substantially higher than those of Defendant. Defendant's and Plaintiff's ability to win contracts

and perform is impacted by the number of and qualifications of their employees. Rowland had specialized training and access to trade secrets and other confidential information. Rowland's employment responsibilities and application of his specialized training could be done outside of a formal office. In other words, Rowland could work remotely from a geographic location of his choosing. The non-competition provision only prohibited performance for one employer for one year. The size of the one prohibited employer in terms of employees was not large or excessive. Based on the aforementioned testimony and evidence, the Court concludes the non-competition provision is reasonable and enforceable in the context of this case and denies Defendant's motion for judgment as a matter of law in its favor.

### 2. Chapter 75 Claim and Punitive Damages

Defendant argues that Plaintiff's Chapter 75 claim fails because Defendant's conduct was not as a matter of law unfair or deceptive. Because this argument is intertwined with the arguments asserted in Defendant's motion under Rule 59(e), the Court considers these arguments together in section D. Defendant's argument under Rules 50(b) and 59(e) for punitive damages are similarly related, so the Court considers them together in section D.

### D. Defendant's Post-Trial Motion under Rule 59(e) and Plaintiff's Motion to Amend Judgment under Rule 59(e)[11]

Rule 59(e) is intended to allow a district court "to correct its own errors [to] 'spar[e] the parties and the appellate courts the burden of unnecessary appellate proceedings.'" Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998) (quoting Russell v. Delco Remy Dev. of Gen. Motors Corp., 51 F.3d 746, 749 (7th Cir. 1995)). Thus, a court may grant a motion under

---

[11] In its reply, Plaintiff withdrew its request to amend the judgment to include an award for cost. (Doc. No. 140 at 5). Therefore, the Court does not consider this request.

Rule 59(e) to alter or amend a judgment if it finds "that there has been an intervening change of controlling law, that new evidence has become available, or that there is a need to correct a clear error or prevent manifest injustice."  Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403, 411 (4th Cir. 2010).  A Rule 59(e) motion seeking to "raise arguments which could have been raised prior to the issuance of the judgment" is not proper.  Pac. Ins. Co., 148 F.3d at 403.

### 1. Chapter 75 Claim

Defendant argues that the judgment should be amended because the Court erred by failing to determine whether the act found by the jury constituted an unfair or deceptive trade practice as a matter of law.  Defendant contends that the jury's finding that Defendant "[c]ontinued to employ Rowland knowing that such employment would cause Rowland to violate his Employment, Non-Disclosure, Non-Solicitation, and Non-Competition Agreement, and pay his attorneys' fees" (Doc. No. 106 at 4) is not an unfair or deceptive practice as a matter of law.  Defendant, therefore, requests an amendment to the judgment and judgment as a matter of law in its favor.  Plaintiff also requests an amendment to the judgment, but it contends the jury's finding that Defendant or its agent misappropriated trade secrets is an "unfair or deceptive" act as a matter of law.  Therefore, Plaintiff asks that the Court to amend the judgment to treble the jury's award for the NCTSPA claim to calculate the damages for Plaintiff's unfair or deceptive trade practices claim.

Federal courts sitting in diversity jurisdiction are bound to follow determinations of the highest court of the state as "the final authority on state law."  Fidelity Union Trust Co. v. Field, 311 U.S. 169, 177-78 (1940).  Intermediate state court determinations must also be followed "in the absence of more convincing evidence of what the state law is."  Id.  As construed by North Carolina courts, an unfair or deceptive trade practice act under N.C. Gen. Stat. § 75-1.1(a)  has

three elements: (1) an unfair or deceptive trade practice, (2) in or affecting commerce, and (3) proximately causing actual injury to plaintiff or plaintiff's business. Furr v. Fonville Morisey Realty, Inc., 130 N.C. App. 541, 551, 503 S.E.2d 401, 408 (1998). When addressing the first element, the Supreme Court of North Carolina has stated:

> The determination of whether an act or practice is an unfair or deceptive practice that violates N.C.G.S. § 75-1.1 is a question of law for the court. See Ellis v. Northern Star Co., 326 N.C. 219, 226, 388 S.E.2d 127, 131 (1990). Ordinarily, once the jury has determined the facts of a case, the court, based on the jury's findings, then determines, as a matter of law, whether the defendant engaged in unfair or deceptive practices in or affecting commerce. Id. Furthermore, this Court has stated that "it does not invade the province of the jury for this Court to determine as a matter of law on appeal that acts expressly found by the jury to have occurred and to have proximately caused damages are unfair or deceptive acts in or affecting commerce under N.C.G.S. § 75-1.1." Id.

Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). Although unfair or deceptive trade practices is not defined by the statute, the North Carolina Supreme Court considers practices deceptive if it has "the tendency or capacity to mislead" and unfair "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981) (citation omitted). The determination that a trade practice is unfair or deceptive "depends upon the facts of [the] case and the impact the practice has in the marketplace." Id. As a result, the intent of the actor is not relevant and the "unfairness and deception [is] gauged by consider[ing] [] the effect of the practice on the marketplace" and the "consuming public." Id.

The highest court in North Carolina has not determined whether misappropriation of trade secrets is an "unfair or deceptive" act or practice as a matter of law, but as raised by Plaintiff, intermediate courts have addressed this issue. The North Carolina Court of Appeals in Medical Staffing Network, Inc. v. Ridgway stated that "[a] violation of the Trade Secrets Protection Act

constitutes an unfair act or practice under N.C. Gen. Stat. § 75-1.1." 194 N.C. App. 649, 659, 670 S.E.2d 321, 329 (2009). However, the Court of Appeals cited section 66-154(b) of the North Carolina General Statute for this proposition, which addressed violations under Article 23—not Article 24 where NCTSPA is codified. Id. Other decision of the North Carolina Court of Appeals have not reached the conclusion in Medical Staffing. Instead, upon rejecting a party's argument that a "violation of the Trade Secrets Protection Act (Article 24, Chapter 66) is *not* an unfair trade practice under N.C. Gen. Stat. § 75-1.1," the Court of Appeals stated that "[i]f the violation of the Trade Secrets Protection Act satisfies [the] three prong test, it would be a violation of N.C. Gen. Stat. § 75-1.1." Drouillard v. Keister Williams Newspaper Servs., Inc., 108 N.C. App. 169, 172, 423 S.E.2d 324, 326 (1992). Drouillard, thus, suggests that there is no per se rule that a violation of the NCTSPA is an unfair or deceptive act or practice under N.C. Gen. Stat. § 75-1.1(a). Given this inconsistency and the confusion created by the erroneous citation, the Court is not convinced that Medical Staffing establishes the state law on this issue, and as explained below, the Court does not believe the North Carolina Supreme Court will adopt the conclusion in Medical Staffing.

Only a few North Carolina Supreme Court decisions have found that a violation of another North Carolina statute constitutes a violation of section 75-1.1 "as a matter of law." In the 1980s, the Supreme Court held that violations of N.C. Gen. Stat. §§ 95-47.6(2) and (9), Winston Realty Co. v. G.H.G., Inc., 314 N.C. 90, 97, 331 S.E.2d 677, 681 (1985), and N.C. Gen. Stat. § 58-54.4 constitute an unfair or deceptive trade practice in violation of N.C. Gen. Stat. § 75-1.1 as a matter of law, Pearce v. Am. Defender Life Ins. Co., 316 N.C. 461, 469, 343 S.E.2d 174, 179 (1986). Both of these cases involved regulatory statutes that did not create private causes of actions but specifically defined unfair or deceptive trade practices in the applicable industry or disallowed

39

conduct to protect the consuming public.  Pearce, 316 N.C. at 468, 343 S.E.2d at 179 ("Unfair or deceptive trade practices in the insurance industry are governed by N.C.G.S. § 58-54.4, a regulatory statute, which defines such practices, in pertinent part, as '[m]aking, issuing, circulating, or causing to be made, issued, or circulated, any . . . statement misrepresenting the terms of any policy issued . . . or the benefits or advantages promised thereby . . . .'"); Winston, 314 N.C. at 97, 331 S.E.2d at 681 ("N.C.G.S. § 95-47.6 prohibits private personnel services from engaging in specific conduct and activities, including the conduct specified in subsections (2) and (9) quoted above. Although the authority to enforce the Chapter 95 provisions rests with the Commissioner of Labor, it is obvious that the list of proscribed acts found in N.C.G.S. § 95-47.6 were designed to protect the consuming public.").

More recently, in Walker v. Fleetwood Homes of North Carolina, Inc., the North Carolina Supreme Court "decline[d] to hold that a violation of a licensing regulation [under the North Carolina Administrative Code] is a UDTP as a matter of law."  362 N.C. 63, 71, 653 S.E.2d 393, 399 (2007).  The Court adopted the Court of Appeal's conclusion in Drouillard that a "a violation of a regulatory statute which governs business activities 'may also be a violation of N.C. Gen. Stat. § 75-1.1' and clarified that "[w]hile such a regulatory violation *may* offend N.C.G.S. § 75-1.1, the violation does not automatically result in an unfair or deceptive trade practice under that statute." Walker, 362 N.C. at 70, 653 S.E.2d at 398.

Based on this precedent, the Court concludes the North Carolina Supreme Court would not hold that a violation of the NCTSPA fulfills the first element of "an unfair or deceptive trade practice" under N.C. Gen. Stat. § 75-1.1(a) as a matter of law.  First, unlike in Pearce, the NCTSPA does not describe the act of misappropriation as unfair or deceptive.  To the contrary, the NCTSPA

conduct to protect the consuming public.  Pearce, 316 N.C. at 468, 343 S.E.2d at 179 ("Unfair or deceptive trade practices in the insurance industry are governed by N.C.G.S. § 58-54.4, a regulatory statute, which defines such practices, in pertinent part, as '[m]aking, issuing, circulating, or causing to be made, issued, or circulated, any . . . statement misrepresenting the terms of any policy issued . . . or the benefits or advantages promised thereby . . . .'"); Winston, 314 N.C. at 97, 331 S.E.2d at 681 ("N.C.G.S. § 95-47.6 prohibits private personnel services from engaging in specific conduct and activities, including the conduct specified in subsections (2) and (9) quoted above. Although the authority to enforce the Chapter 95 provisions rests with the Commissioner of Labor, it is obvious that the list of proscribed acts found in N.C.G.S. § 95-47.6 were designed to protect the consuming public.").

More recently, in Walker v. Fleetwood Homes of North Carolina, Inc., the North Carolina Supreme Court "decline[d] to hold that a violation of a licensing regulation [under the North Carolina Administrative Code] is a UDTP as a matter of law."  362 N.C. 63, 71, 653 S.E.2d 393, 399 (2007).  The Court adopted the Court of Appeal's conclusion in Drouillard that a "a violation of a regulatory statute which governs business activities 'may also be a violation of N.C. Gen. Stat. § 75-1.1' and clarified that "[w]hile such a regulatory violation *may* offend N.C.G.S. § 75-1.1, the violation does not automatically result in an unfair or deceptive trade practice under that statute." Walker, 362 N.C. at 70, 653 S.E.2d at 398.

Based on this precedent, the Court concludes the North Carolina Supreme Court would not hold that a violation of the NCTSPA fulfills the first element of "an unfair or deceptive trade practice" under N.C. Gen. Stat. § 75-1.1(a) as a matter of law.  First, unlike in Pearce, the NCTSPA does not describe the act of misappropriation as unfair or deceptive.  To the contrary, the NCTSPA

conduct to protect the consuming public.  Pearce, 316 N.C. at 468, 343 S.E.2d at 179 ("Unfair or deceptive trade practices in the insurance industry are governed by N.C.G.S. § 58-54.4, a regulatory statute, which defines such practices, in pertinent part, as '[m]aking, issuing, circulating, or causing to be made, issued, or circulated, any . . . statement misrepresenting the terms of any policy issued . . . or the benefits or advantages promised thereby . . . .'"); Winston, 314 N.C. at 97, 331 S.E.2d at 681 ("N.C.G.S. § 95-47.6 prohibits private personnel services from engaging in specific conduct and activities, including the conduct specified in subsections (2) and (9) quoted above. Although the authority to enforce the Chapter 95 provisions rests with the Commissioner of Labor, it is obvious that the list of proscribed acts found in N.C.G.S. § 95-47.6 were designed to protect the consuming public.").

More recently, in Walker v. Fleetwood Homes of North Carolina, Inc., the North Carolina Supreme Court "decline[d] to hold that a violation of a licensing regulation [under the North Carolina Administrative Code] is a UDTP as a matter of law."  362 N.C. 63, 71, 653 S.E.2d 393, 399 (2007).  The Court adopted the Court of Appeal's conclusion in Drouillard that a "a violation of a regulatory statute which governs business activities 'may also be a violation of N.C. Gen. Stat. § 75-1.1' and clarified that "[w]hile such a regulatory violation *may* offend N.C.G.S. § 75-1.1, the violation does not automatically result in an unfair or deceptive trade practice under that statute." Walker, 362 N.C. at 70, 653 S.E.2d at 398.

Based on this precedent, the Court concludes the North Carolina Supreme Court would not hold that a violation of the NCTSPA fulfills the first element of "an unfair or deceptive trade practice" under N.C. Gen. Stat. § 75-1.1(a) as a matter of law.  First, unlike in Pearce, the NCTSPA does not describe the act of misappropriation as unfair or deceptive.  To the contrary, the NCTSPA

acknowledges that misappropriation can occur by mistake or in good faith. N.C. Gen. Stat. § 66-154(a)(2). Second, unlike Winston and Pearce, the NCTSPA creates a private cause of action for the "owner of a trade secret." N.C. Gen. Stat. § 66-153. Third, the limitation of standing to the "owner of a trade secret" reflects that the legislature's purpose was not to protect consumers as in Winston and Pearce but rather to protect property rights. Finally, Walker suggests that per se unfair or deceptive trade practices are the exception, not the rule. The Supreme Court in Walker clarified that "[w]hile a regulatory violation *may* offend N.C.G.S. § 75-1.1, the violation does not automatically result in an unfair or deceptive trade practice under that statute." Walker, 362 N.C. at 70, 653 S.E.2d at 398. This clarification, and the favorable citation to Drouillard, suggests that the North Carolina Supreme Court is not inclined to recognize violations of regulations or statutes as "unfair or deceptive trade practices" as a matter of law. Therefore, given the dissimilarities between the NCTSPA and the statutes analyzed in Winston and Pearce, the Court perceives that the North Carolina Supreme Court would not hold that a violation of the NCTSPA is an "unfair or deceptive" practice or act as a matter of law and instead require courts to assess the factual findings of the jury to determine if the act or practice is "unfair" or "deceptive" as previously defined by the North Carolina Supreme Court.

Considering the facts and the impact on the marketplace, this Court must determine whether the jury's finding that Defendant, or an agent of Defendant, misappropriated the trade secret of Plaintiff which caused economic loss to Plaintiff or unjust enrichment, amounting to damages of $600,000 is unfair or deceptive. (Doc. No. 106 at 4). As the only fact beyond a finding of a regulatory violation of the Trade Secrets Protection Act is damages in the amount of $600,000, the Court must consider whether this finding by the jury results in turning the violation of the Act,

which, as previously concluded, is not a "unfair or deceptive practice or act" under 75-1.1 as a matter of law, into an "unfair" or "deceptive" act.  When determining damages, the jury considered any loss in profits by Plaintiff, loss of value in Plaintiff's business as a going concern, and the value of any trade secrets misappropriated by Defendant.  Based on these instructions, the Court concludes that this finding of damages in this amount does not suggest that Defendant's practice had a "tendency or capacity to mislead" Plaintiff or third-parties nor does it suggest that Defendant's practice was "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" or "offends public policy."  Marshall, 302 N.C. at 548, 276 S.E.2d at 403 (citation omitted).  Therefore, Plaintiff's motion to amend the judgment to treble damages under N.C. Gen. Stat. § 75-1.1 using the damages found for violation of the Trade Secret Protection Act is denied.

Next, the Court considers whether Defendant's practice of "continu[ing] to employ Rowland knowing that such employment would cause Rowland to violate his Employment, Non-Disclosure, Non-Solicitation, and Non-Competition Agreement, and pay his attorneys' fees" is an "unfair" or "deceptive" practice as a matter of law.  (Doc. No. 106 at 4).  The Court concludes that in this case, it is.  Here, the jury also found that Defendant wrongfully interfered with the Agreement between Rowland and Plaintiff.  (Doc. No. 106 at 1).  To reach this conclusion, the jury had to find that Defendant's practice was unjustified as lack of justification is an element of the claim.  Embree, 330 N.C. at 498, 411 S.E.2d at 924 (listing the elements of tortious interference with contract).  Interference with a contract by hiring an at-will employee of a competitor is often justified and the result of lawful competition.  See Peoples Sec. Ins. Co. v. Hooks, 322 N.C. 216, 222, 367 S.E.2d 647, 650-51 (1988) (applying "the general principle that interference may be justified when the plaintiff and the defendant are competitors" because "[t]o hold otherwise would

unduly limit lawful competition").  Yet, an unjustified interference combined with continuing to hire Rowland knowing it would cause a violation of the Agreement and paying his attorneys' fees is an "immoral, unethical, oppressive, [and] unscrupulous" practice.  Marshall, 302 N.C. at 548, 276 S.E.2d at 403 (citation omitted).  Such a practice can distort the marketplace.  See id.; United Labs., 102 N.C. App. at 492, 403 S.E.2d at 109 (concluding similar factual findings by jury "constituted unfair methods of competition and did not promote good faith dealings between [competitors]").  Accordingly, the Court denies Defendant's motions under Rule 59(e) and 50(b) for the Chapter 75 claim and reaffirms the entry of judgment in accordance with the jury's verdict. To the extent necessary, the Court amends the judgment to reflect that the Court concludes that the practice found by the jury was unfair as a matter of law.

### 2. Punitive Damages

Defendant has not argued that entry of judgment in accordance with the jury's verdict is a clear error of law.  Instead, Defendant requests this Court enter findings "disturbing" the jury's finding of punitive damages.  (Doc. No. 127 at 18 (citing N.C. Gen. Stat. § 1D-50)).  The Court does not believe such a request is proper under Rule 59(e),[12] but regardless, the Court denies Defendant's request.  The Court has already concluded that the jury's verdict on claims of tortious interference with contract, which is not based on vicarious liability, stands.  Further, direct liability under agency theory occurs upon express authorization or ratification, of which sufficient evidence

---

[12] North Carolina appellate courts have held that trial courts are not required to issue a written opinion regarding the award of punitive damages when the amount of punitive damages does not exceed the statutory limit.  Babb v. Graham, 190 N.C. App. 463, 478-79, 660 S.E.2d 626, 636 (2008) ("As the language of the statute does not require judicial review of a punitive damage award to be mandatory and we find no case law holding judicial review to be mandatory except in cases where the award exceeds the statutory limits, the trial court did not err in failing to make specific findings of fact . . . ." (quoting Zubaidi v. Earl L. Pickett Enters., Inc., 164 N.C. App. 107 , 118, 595 S.E.2d 190 , 196 (2004)).

was presented for the NCTSPA claim.  <u>Creel</u>, 152 N.C. App. at 202-03, 566 S.E.2d at 833; Restatement (Third) of Agency § 7.03 (2006).  Thus, the award of punitive damages is not based "solely on vicarious liability for the acts or omissions of another."  N.C. Gen. Stat. § 1D-15(c).

Additionally, no clear error or manifest injustice occurred by entering judgment on the award.  Here, the jury was instructed to consider the purposes of punitive damages and to only consider evidence relevant to an award of punitive damages under N.C. Gen. Stat. § 1D-35. Substantial evidence of willful and wonton conduct related to the tortious interference with the Agreement to support an award of punitive damages was also presented at the trial.  Willful or wonton conduct is defined as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm."  N.C. Gen. Stat. § 1D–5(7).  It "means more than gross negligence."  N.C. Gen. Stat. § 1D–5(7).  Among other things previously discussed, testimony was presented that Defendant continued to employ Rowland and pay his attorneys' fees after learning of Rowland's Agreement with Plaintiff, the commencement of a suit by Plaintiff against Rowland to enforce the Agreement and enjoin his employment by Defendant, Rowland's possession of Plaintiff's information, and Rowland's destruction of potentially relevant evidence.  From this testimony, a reasonable jury could conclude Defendant consciously and intentionally disregarded the rights of Plaintiff under the Agreement, which this Court has held to be enforceable.  Therefore, the Court denies Defendant's motions under Rule 50(b) and 59(e).

### 3. Prejudgment Interest

Plaintiff contends it is entitled to prejudgment interest of 8% under N.C. Gen. Stat. § 24-5(b).  Defendant disagrees and argues the Court has the discretion to award prejudgment interest,

and if it does award prejudgment interest, it should be awarded at the federal rate of interest.  The Fourth Circuit has recognized that other circuits have held that courts must apply the law of the forum to questions involving prejudgment interest in diversity cases.  United States v. Dollar Rent A Car Sys., Inc., 712 F.2d 938, 940 (4th Cir. 1983) (citing Klaxon, 313 U.S. at 497; Clissold v. St. Louis-San Francisco Ry., 600 F.2d 35, 38-39 (6th Cir. 1979); Am. Ins. Co. v. First Nat'l Bank in St. Louis, 409 F.2d 1387, 1392 (8th Cir. 1969)).  However, as pointed out by Defendant, the Fourth Circuit and district courts have not always been consistent when awarding prejudgment interest in diversity cases.  District courts sitting in diversity jurisdiction have stated that the determination of prejudgment interest is at the court's discretion and cited the Fourth Circuit's decision Maksymchuk v. Frank.  See e.g., Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 727 (4th Cir. 2000) (citing Maksymchuk v. Frank, 987 F.2d 1072, 1077 (4th Cir. 1993)); Chase Manhattan Mortg. Co. v. Lane, No. 3:09-cv-47, 2010 WL 2738266, at *3 (W.D.N.C. July 9, 2010) (same).  Yet, Maksymchuk relied on precedent from a non-diversity case when it stated "[t]he award of prejudgment interest would appear to be a matter within the district court's discretion."  987 F.2d at 1077 (citing United States v. Gregory, 818 F.2d 1114, 1118 (4th Cir. 1987)).  As this is a diversity case, the Court concludes it is not bound by Makysmchuk and instead is bound to follow the law of the forum as it pertains to prejudgment interest.  In North Carolina, the legislature has enacted a statute governing prejudgment interest that provides "[i]n an action other than contract, any portion of a money judgment designated by the fact finder as compensatory damages bears interest from the date the action is commenced until the judgment is satisfied."  N.C. Gen. Stat. § 24-5(b).  The statute creates no exceptions or conditions, and in Hamby v. Williams, the North Carolina Court of Appeals held N.C. Gen. Stat. § 24-5(b) "to be mandatory and not discretionary

on the part of the trial court, and that the trial court erred in not awarding prejudgment interest to plaintiff." 196 N.C. App. 733, 738, 676 S.E.2d 478, 481 (2009). The Fourth Circuit, in an unpublished opinion, also construed N.C. Gen. Stat. § 24-5(b) as a mandatory provision. Castles Auto & Truck Servs., Inc. v. Exxon Corp., 16 F. App'x 163, 168 (4th Cir. 2001). Therefore, the Court concludes that it is bound to award prejudgment interest on Plaintiff's compensatory damages for the period from December 2, 2015 to August 10, 2017, at the state of North Carolina's legal interest rate of 8%, N.C. Gen. Stat. § 24-1. Plaintiff characterizes the judgment as awarding $600,002 as compensatory damages. Defendant does not object to this characterization. Thus, the Court amends the judgment to reflect that Plaintiff is entitled to 8% prejudgment interest on $600,002 ($131.072 per day) from December 2, 2015 through August 10, 2017 in the total amount of $81,140.00.

### 4. Post-Judgment Interest

Plaintiff ask the Court to amend the judgment to reflect that it is entitled to post-judgment interest. Plaintiff contends when calculated pursuant to 28 U.S.C. § 1961, the post-judgment interest rate is 1.228% from the judgment date of August 10, 2017. Defendant agrees with this calculation. Therefore, the post-judgment interest rate of 1.228% shall apply to Plaintiff's total damages award, as set forth in this order, from August 10, 2017 until satisfied.

### E. Plaintiff's Motion for Attorneys' Fees

Plaintiff seeks an award of attorneys' fees under North Carolina's Unfair or Deceptive Trade Practices Act and the Trade Secrets Protection Act, in the total amount of $719,881.50. Because the Court finds that Plaintiff is entitled to attorneys' fees under the NCTSPA and awards reasonable attorneys' fees, the Court declines to consider Plaintiff's request for attorneys' fees

under the Unfair or Deceptive Trade Practices Act. The Court denies Plaintiff's motion for attorneys' fees to this extent as moot.

### 1. Attorneys' Fees under North Carolina's Trade Secrets Protection Act

Under the NCTSPA, the court may award "reasonable attorneys' fees to the prevailing party" "if willful and malicious misappropriation exists[.]" N.C. Gen. Stat. § 66-154(d).

> Willful means intentionally. Willful is used in contradistinction to accidental or unavoidably. Malicious means an action taken in a manner which evidences a reckless and wanton disregard of the plaintiff's rights.

Silicon Knights, Inc. v. Epic Video Games, Inc., 917 F. Supp. 2d 503, 518-519 (E.D.N.C. 2012) (internal citations, alterations, and quotations omitted).

Here, the jury awarded actual damages of $600,000 for misappropriation of trade secrets and awarded punitive damages of $100,000. (Doc. No. 106 at 4). To enter an award of punitive damages, the jury had to find the existence of willful and wanton conduct relating to an injury to Plaintiff for which they had already awarded relief, which included misappropriation of trade secrets and tortious interference with contract. Willful and wonton conduct's definition is for all substantive purposes the same as a willful and malicious. Specifically, willful and wanton conduct is defined as "the conscious and *intentional disregard* of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C. Gen. Stat. § 1D–5(7) (emphasis added). Therefore, Plaintiff correctly argues that the jury found Defendant's conduct "willful and malicious." Testimony and evidence presented at trial further supports that "willful and malicious *misappropriation* exists." N.C. Gen. Stat. § 66-154(d). After receiving an oral offer from Defendant and providing his two week notice to Plaintiff, Rowland download information from his work computer at Plaintiff's

office to his SD card. Plaintiff automatically backed up its computers. It was against company policy for employees to unilaterally back up their information. The downloaded information included information that Rowland did not use regularly for his employment. When Rowland started working for Defendant, he possessed the SD card with Plaintiff's information, including trade secrets. Rowland used software to delete and remove any forensic evidence of over a thousand files in close proximity to material events in the lawsuits brought by Plaintiff. Defendant continued to employ Rowland and pay for his legal counsel after discovering that Rowland possessed Plaintiff's information and deleted potentially relevant information from his computer. As the jury concluded, it did this knowing it "would cause Rowland to violate his [Agreement with Plaintiff]" (Doc. No. 106 at 4) which prohibited Rowland from disclosing confidential information and trade secrets. Based on this evidence, the inference allowed by spoliation, and the jury's findings, the Court finds that willful and malicious misappropriation exists, and in the exercise of its discretion, awards reasonable attorneys' fees.

### 2. Reasonable Fees

Next, the Court must assess whether the attorneys' fees sought are reasonable. To make this determination, the Court assesses and makes findings of facts "as to the time and labor expended, the skill required, the customary fee for like work, and the experience or ability of the attorney." United Labs., Inc., 102 N.C. App. at 494, 403 S.E.2d at 111 (quoting Cotton v. Stanley, 94 N.C. App. 367, 369, 380 S.E.2d 419, 421 (1989)). Guided by these findings and the twelve factors set forth in Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978), the court determines what constitutes a reasonable number of hours and reasonable rate. Brodziak v. Runyon, 145 F.3d 194, 196 (4th Cir. 1998) (citing Barber, 577 F.2d at 226 n.28).

Here, Plaintiff spent 2,272.95 hours pursuing its claims against Defendant at an expense of $719,881.50. (Doc. No. 111 at 6). Defendant objects to the fee requested on several grounds. In particular, Defendant argues the fee must be reduced to remove time spent on unsuccessful claims and to be proportional to the results obtained. Additionally, Defendant objects to some work as redundant and duplicative due to Plaintiff's own decisions, such as moving for a continuance or involving multiple attorneys. Defendant further argues no evidence to substantiate the fees incurred by its counsel in Georgia have been provided.

After review of the declarations of attorneys Raboteau T. Wilder, Jr. and G. Kirkland Hardymon and the accompanying billing records, the Court finds as follows. This case was a complex case requiring attorneys of skill and experience to expend a significant amount of time to pursue the claims. The case involved multiple claims all arising from Rowland's employment with Defendant and his possession of Plaintiff's confidential and proprietary information during his employment with Defendant. The jury found Defendant liable on all but Plaintiff's claims for tortious interference with prospective economic advantage and awarded Plaintiff $700,002. For cases of this nature, it is not unusual for multiple attorneys to work on the case. The time and labor expended by counsel for Plaintiff in this litigation was reasonable, even if it resulted in some duplication of effort. Typical hourly fees for complex business litigation in North Carolina range from $250 to $450 per hour. See In re Newbridge Bancorp S'holder Litig., No. 15 CVS 9251, 2016 WL 6885882, at *14 (N.C. Super. Ct. Nov. 22, 2016). As the highest hourly rate sought by Plaintiff is $445, the hourly fees sought by Plaintiff, for counsel in North Carolina and in Georgia, are commensurate with fees charged in similar cases requiring attorneys of similar skill and experience. The fees charged by each lawyer are aligned with their skill and experience. Retaining

counsel in Georgia was necessary in this litigation and the fees of counsel obtain in Georgia are within the range of typical fees for litigation in North Carolina.[13]  Based on these findings of facts and the factors in <u>Barber</u>, the Court concludes that the time expended by counsel for Plaintiff and the fees charged are reasonable.

The Court also finds that reducing the fee for other claims is not necessary.  Apportionment is not necessary when the claims in the case arise from the same nucleus of operative fact and are inextricably interwoven with each other.  <u>Whiteside Estates, Inc. v. Highlands Cove, LLC</u>, 146 N.C. App. 449, 553 S.E.2d 431 (2001).  Defendant argues that the rationale in <u>Whiteside</u> does not apply when the claims are separate and distinct, but <u>Whiteside</u> involved three distinct claims—nuisance, trespass, and violation of the Sedimentation Pollution Control Act of 1973—that all arose from "defendant's land-disturbing activity and its impact on plaintiff's property."  <u>Id.</u> at 467, 553 S.E.2d at 443.  Here, all the claims arise out of MediQuant's decision to hire and retain Rowland despite the Agreement and his possession of the SD card.  The claims, although different, are also inextricably interwoven.  Thus, the Court concludes that apportioning fees for each claim is unnecessary.  Therefore, the Court grants Plaintiff's motion for attorneys' fees and awards Plaintiff $719,881.50 in attorneys' fees.

## F. Plaintiff's Motion for Permanent Injunction

A plaintiff must show it is entitled to a permanent injunction for misappropriation of trade secrets by satisfying four equitable requirements.  <u>BridgeTree, Inc. v. Red F Marketing LLC</u>, No. 3:10-cv-00228-FDW-DSC, 2013 WL 443698, at *22 (W.D.N.C. Feb. 5, 2013).

---

[13] Although neither party has submitted evidence that the hourly rates charged by the attorneys of Chamberlain, Hrdlicka, White, Williams & Aughtry are commensurate with typical fees charged in Atlanta, Georgia for attorneys of their skill and experience, the Court finds this omission harmless.

> Specifically, a plaintiff must show: "(1) that it has suffered an irreparable injury;
> (2) that remedies available at law, such as monetary damages, are inadequate to
> compensate for that injury; (3) that, considering the balance of hardships between
> the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent injunction."

Id., at *22 (quoting eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006)). The decision

to grant or deny a motion for a permanent injunction is a matter within the court's discretion. Id.

This Court has previously construed the statutory language providing that "actual . . .

misappropriation of a trade secret . . . shall be permanently enjoined upon judgment finding

misappropriation," N.C. Gen. Stat. § 66-154 (a), as creating a presumption of irreparable injury

and irreparable harm absent an injunction. Id. at *22.[14] Thus, upon a finding of misappropriation,

the court will presume that the first equitable requirement has been shown absent rebutting

evidence.

As the jury found Defendant misappropriated Plaintiff's trade secrets, there is a rebuttable

presumption that Plaintiff has suffered an irreparable injury and will suffer irreparable harm absent

an injunction. Defendant, however, offers evidence to rebut the presumption. The declaration of

Defendant's president Paparella states that Defendant terminated Rowland effective August 11,

2017. (Doc. No. 144 at 1). Defendant also presents the jury's finding that Defendant itself did not

---

[14] Additionally, the Court cannot construe section 66-154(a) as requiring or mandating a permanent injunction, as
requested by Plaintiff, because it would be inconsistent with subsection (b) which allows a court to decline to impose
a permanent injunction. See, e.g., State Board of Agric. v. White Oak-Buckle Drainage Dist., 177 N.C. 222, 98 S.E.
597, 599 (1919) (holding that the court when construing a statute must "examine the entire statute to ascertain its
meaning, and to give force and effect to every part of it, reconciling, when reasonably possible, any seeming conflicts,
by comparing its sections and provisions with each other."); see also Weinberger v. Romero-Barcelo, 456 U.S. 305,
320 (1982) ("[M]ajor departure[s] from the long tradition of equity practice should not be lightly implied. . . . [W]e
construe the statute at issue 'in favor of that interpretation which affords a full opportunity for equity courts to treat
[the matter] . . . in accordance with their traditional practices . . . (citation omitted)). Section 66-154(b) allows the
court to impose conditions on the use of trade secret "[i]f the court determines that it would be unreasonable to enjoin
use after a judgment finding misappropriation." N.C. Gen. Stat. § 66-154(b).

acquire or use Plaintiff's trade secrets as conclusive proof that the jury, abiding by the Court's instructions, only concluded that Defendant's agent Rowland misappropriated the trade secrets.

Courts grant injunctive relief "only when irreparable injury is both real and immediate." Pee Dee Elec. Membership Corp. v. Carolina Power & Light Co., 256 N.C. 56, 60, 122 S.E.2d 761, 763 (1961). Therefore, courts will not exercise their injunctive powers for "[c]ompleted acts and past occurrences in the absence of any evidence tending to show an intention on the part of the defendants to [commit future violations.]" State ex rel. Bruton v. Am. Legion Post, 256 N.C. 691, 693, 124 S.E.2d 885, 886–87 (1962). As previously discussed, the Court agrees that the jury did not find that Defendant—apart from its agent Rowland—possessed or used Plaintiff's trade secrets. It follows that upon the termination of Rowland as an employee, Defendant loses control over its agent that acquired, used, or disclosed the trade secrets and as a result loses its control over the trade secrets. Thus, there is no longer evidence tending to show Defendant's intent to commit future violations—it's employment of Rowland. The jury also found any past injury from misappropriation attributable to Defendant to be compensable through monetary damage by awarding $600,000 for the actual injury suffered by Plaintiff. (Doc. No. 106 at 4). Thus, the Court concludes that Defendant has rebut the presumption of irreparable injury or harm.

Based on the trial record and the record relating to Plaintiff's motion for a permanent injunction,[15] the Court concludes that Plaintiff has not shown irreparable injury or the insufficiency of remedies at law. However, the Court is aware that the termination of Rowland does not preclude the possibility of a future agency relationship between Rowland and Defendant. Therefore, the

---

[15] The Court considered all briefs and exhibits filed supporting or opposing Plaintiff's Motion for Permanent Injunction and Plaintiff's Motion to Withdraw and Refile Motion for Permanent Injunction or, in the alternative, Motion for Leave to File Memorandum in Support of Motion for Permanent Injunction. The Court previously recognized the sufficiency of the record on this matter. (Doc. No. 146).

Court denies Plaintiff's motion for a permanent injunction without prejudice and retains jurisdiction to address any subsequent motion for a permanent injunction.

## III. CONCLUSION

IT IS THEREFORE ORDERED that for the reasons explained above:

1. Defendant's Post-Trial Motion under Rule 59 (Doc. No. 126) is DENIED.

2. Defendant's Post-Trial Motion under Rules 49(b) and 50(b) (Doc. No. 124) is DENIED.

3. Plaintiff's Motion to Amend Judgment (Doc. No. 120) is GRANTED IN PART and DENIED IN PART. The Court amends the judgment as follows:

    a. To the extent necessary, the Court amends the judgment to reflect that the Court concludes that the practice found by the jury was unfair as a matter of law.

    b. Plaintiff is entitled to prejudgment interest of $81,140.00.

    c. Plaintiff is entitled to 1.228% post-judgment interest from August 10, 2017 until satisfied on $1,503,021.50.[16]

4. Plaintiff's Motion for Attorneys' Fees (Doc. No. 108) is GRANTED IN PART and DENIED IN PART. The Court awards Plaintiff $719,881.50 in attorneys' fees pursuant to N.C. Gen. Stat. § 66-154(d) and DENIES Plaintiff's Motion pursuant to N.C. Gen. Stat. § 75-16.1(1) as MOOT.

5. Plaintiff's Motion for Permanent Injunction (Doc. No. 123) is DENIED without prejudice.

---

[16] This is the sum of compensatory damages ($602,000), punitive damages ($100,000), prejudgment interest ($88,140.00) and attorneys' fees ($719,881.50).

IT IS SO ORDERED.

Signed: December 4, 2017

Frank D. Whitney
Chief United States District Judge